IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PEARLSHIRE CAPITAL GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 4787 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ANA REHAN ZAID and | ) | |
| RRZ REAL ESTATE LLC, an Illinois | ) | |
| Limited Liability Co., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Plaintiff has filed "Objections to Defendants' Privilege Assertions and Motion to Compel Discovery Compliance" [Dkt. #109], which seeks production of about 800 documents over which the defendants have asserted the privilege. For the reasons in the accompanying Memorandum Opinion, the Motion [Dkt. #109] is granted, and the Defendant is ordered to produce the documents in the privilege log in seven days.

**ARGUMENT**

This case is two years old. It's not entirely clear what has been going on in that time, other than the fact that the Plaintiff has filed four versions of his Complaint. They say they have exchanged about a quarter million documents in discovery. [Dkt. #93]. But, despite the parties' representations to the contrary, massive discovery issues have been left to the eleventh hour and beyond.

The case was reassigned to Judge Kness on February 28, 2020 [Dkt. #77], and he indicated that the deadlines his predecessor, Judge Shah, had set remained in effect as of March 9, 2020. [Dkt. #79]. Just a week later, however, the first of Chief Judge Pallmyer's Coronavirus Orders was

entered, the amalgam of which extended deadlines by 77 days. [Dkt. #80]. As per Judge Shah's Order, the Covid-19 Orders extended the March 31st deadline to June 16th. [Dkt. ##71, 85, at 4]. The parties told the court that, as of March 9, 2020, they were nearly finished with written discovery and would be done with it in three weeks, by the March 31, 2020 deadline. [Dkt. #85, at 4].

But, even with so much extra time, the parties didn't make the new June 16th deadline. The parties' representations that they had been just three weeks from completing discovery at the beginning of March were not close to reality. In fact, they sought what they termed a six-week "extension" of the June16th deadline on June 24th which, of course, was actually a motion to reopen fact discovery. [Dkt. #88]. Judge Kness generously granted the motion, and set another new deadline: July 27, 2020. [Dkt. #90]. And he stressed: "No further extensions of these deadlines will be granted absent extraordinary circumstances." [Dkt. #90].

But then, on the day of the expiration of the deadline, the Plaintiff filed *another* Motion for an extension – this one to allow the filing of a motion to compel fact discovery *after* the close of fact discovery. [Dkt. #93]. Plaintiff's counsel said the parties had made "good progress," although he anticipated needing to file a motion to compel regarding the defendants' assertion of the privilege as to certain documents. [Dkt. #93]. This was misleading, to say the least. Left unsaid was the fact that this remaining dispute involved a motion to compel covering almost 900 pages with exhibits, a 90-page privilege log, 800 at-issue documents, allegations of crime/fraud, and suggestions that an *in camera* review of those documents if not a mini-trial[1] might be necessary to resolve the one little

---

[1] It is perhaps worthwhile pointing out to the parties that an *in camera* review of some 800 documents would be both unwieldy and extremely time-consuming, pandemic or no. When the numbers of documents to be reviewed move well into the hundreds, courts in this Circuit find it appropriate and far more efficient to engage a special master under Fed.R.Civ.P. 53(a)(1)(C). *See, e.g.,Am. Nat. Bank & Tr. Co. of*
(continued...)

thing left to take care of. Not to mention a response and reply brief which, with exhibits, ave turned out to cover an additional 380 pages. That's not "good progress" by any stretch of the imagination and to have told Judge Kness what was said was misleading to say the least. Generally speaking, representations made in support of motions for extensions of deadlines – easily the most common motions in any courthouse – are taken with the proverbial grain of salt. But what was said to Judge Kness did not begin to convey the true state of things. Lawyers have an obligation to be candid with the court. *Cleveland Hair Clinic, v. Puig*, 200 F.3 1063, 1067-68 (7th Cir. 2000).

All that is maddening but, sadly, all too common. The most remarkable revelation was that, at that very late date, with fact discovery closed, the defendant *had not yet produced* complete

---

$^1$(...continued)
*Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 880 (7th Cir. 2005)(400 documents); *Schmucker v. Johnson Controls, Inc*., 2017 WL 6043328, at *1 (N.D. Ind. 2017)(358 documents); *Finnegan v. Myers*, 2014 WL 12789809, at *8 (N.D. Ind. 2014)(600 documents); *In re FedEx Ground Package Sys., Inc*., 2007 WL 79312, at *8 (N.D. Ind. 2007); *Avery Dennison Corp. v. UCB Films PLC*, 1998 WL 703647, at *1 (N.D. Ill. 1998)(800 documents). The practice is far more common in other circuits and is employed even with relatively few documents at issue. *IQVIA, Inc. v. Veeva Sys., Inc*., 2020 WL 2039836, at *2 (D.N.J. 2020)(34 documents); *In re Lincoln Nat'l COI Litig*., 2020 WL 1157172, at *1 (E.D. Pa. 2020)(21 documents); *Orexo AB v. Actavis Elizabeth LLC*, 2018 WL 5891690, at *1 (D. Del. 2018)(29 documents); *Nat.-Immunogenics Corp. v. Newport Trial Grp*., 2018 WL 6137597, at *2 (C.D. Cal. 2018)(364 documents); *Engage Healthcare Commc'ns, LLC. v. Intellisphere, LLC*., 2017 WL 10259774, at *1 (D.N.J. 2017)(58 documents).

In addition, in this circumstance, it is far more fair to have the parties bear the costs of their dispute as a tax-payer subsidized – *see, e.g., Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325, 329 (7th Cir. 1991) ("Litigation is costly not only for the litigants but also for parties in other cases waiting in the queue for judicial attention."); *Chapman v. First Index, Inc*., 796 F.3d 783, 787 (7th Cir. 2015)(the public should not be made to subsidize needless disputes) – review of 800 documents would monopolize the court's attentions and be patently unfair to the other litigants waiting in the queue, most of whom have honed their discovery disputes through the meet-and-confer process to far more manageable levels long before discovery closed. *See* Fed.R.Civ.P. 53(a)(3).

Accordingly, when matters of this nature advance to an *in camera* review or proceedings, a special master would surely be appointed at the parties' expense – often the losing party is made to foot the bill, *see, e.g., In re FedEx Ground Package Sys., Inc.*, 2007 WL 79312, at *6 (N.D. Ind. 2007) – in accord with Fed.R.Civ.P. 53(b)(1) and (2). We point this out as neither party seems to have taken this eventuality into account in their submissions.

privilege logs for the documents it had been withholding from discovery throughout this case. [Dkt. #93, Par. 12]. Such tardiness and failure to comply with Fed.R.Civ.P. 26(b)(5) can, in many circumstances, be found to constitute a waiver of the privilege as to the unlogged documents. *See, e.g., Blackard v. Hercules, Inc.*, 2014 WL 2515197 at *5 (S.D.Miss. 2014); *S.E.C. v. Yorkville Advisors LLC*, 300 F.R.D. 152, 167 (S.D.N.Y. 2014); *Richmond v. Smith & Wollensky Restaurant Group, Inc.*, 2007 WL 1521117 (S.D.N.Y. 2007). *See also Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 160 (N.D. Ill. 2020)("So, the privilege log was not only late, it didn't claim Exhibit 5 was privileged. The claims regarding Exhibit 5 being protected by both the attorney client privilege and the work product doctrine, then, are brand new and, given the foregoing history, have been waived. "); *Surgery Ctr. at 900 N. Michigan Ave., LLC v. Am. Physicians Assurance Corp., Inc.*, 317 F.R.D. 620, 631 (N.D. Ill. 2016)("Arguably, they waived their claim of privilege as to these unidentified documents then and there."); *Baxter International, Inc. v. Becton, Dickinson and Company*, 2019 WL 6258490, at *12 n. 13 (N.D. Ill. 2019) (forfeiture of work product protection where protection was not asserted in privilege log); *Smith v. Bd. of Education of City of Chicago*, 2019 WL 2525890, at *4 (N.D. Ill. 2019)(waiver of work product protection where claim not asserted in privilege log); *Rao v. Bd. of Trustees of the Univ. of Illinois*, 2016 WL 6124436, at *7 (N.D. Ill. 2016)("A timely and adequate privilege log is required by the federal rules, and the failure to serve an adequate and timely privilege log may result in a waiver of any protection from discovery."). But, the Plaintiff did not press the argument, and, finding that the defendant's tardiness qualified as an "extraordinary circumstance," Judge Kness granted Plaintiff's motion. [Dkt. #95]. He then referred the Plaintiff's discovery motion here. [Dkt. #104].

      And, so, here we are. Distilled to its essence, the present controversy is about a person doing

a family friend a favor and living to regret it. Two years into this case, however, all we have are allegations and accusations on both sides. Nothing has been addressed or resolved with a dispositive motion, so the only view of the case is an amalgam of those allegations and accusations on both sides. What we have said should not be interpreted as suggesting that we have an impression that either side is right or wrong or that one side is wearing a white hat and the other is not. Long experience teaches two things: tentative impressions are often as wrong as they are right and that white hats, like haloes, rarely fit through the courthouse doors.

**Bagasrawala Sponsors Zaid**

The Plaintiff, Pearlshire Capital Group ("PCG"), is, essentially, Farrukh Bagasrawala. He formed PCG in 2013 in order to invest in the hospitality industry. In 2013, PCG successfully negotiated the purchases of hotels in Itasca, Roselle, and Countryside, Illinois, and closed those purchases in the names of single purpose entities which, in turn, were controlled by Bagasra Real Estate LLC ("BRE"), another SPE that Bagasrawala solely owned. This was going to be the general idea going forward.

The Bagasrawala family went back some time with the defendant's family, the Zaids. The two families invested together for years. The defendant, Rehan Zaid, came here from Pakistan and went to college at DePaul University, earning a degree in Hospitality Leadership & Lodging Management. After a brief stint as a consultant with a hospitality firm, Zaid joined PCG. He had to get an H-1B work visa to remain in the United States, and needed PCG as a sponsor. As a family friend and an associate, Bagasrawala sponsored Zaid to work for PCG as a financial analyst. Among other duties, he was to analyze existing hotel properties and potential sites for PCG and future joint ventures. [Dkt. ##1-1, 114-1]. He began this work in Ocotber 2014, at twenty-seven

years of age. [Dkt. #1-1].

H–1B visas allow U.S. companies to hire noncitizen workers in "specialty occupations," defined as those that typically require at least a bachelor's degree in a specific field of study. *See* 8 U.S.C. § 1184(i); *Rubman v. U.S. Citizenship & Immigration Servs.*, 800 F.3d 381, 384 (7th Cir. 2015). H-1BVisa holders are able to work in the U.S. for three years (extendable to six), after which they must apply for a different visa or return to their home country (there's no path to citizenship). The employer sponsors the visa applicant, and has to submit an application, meet certain requirements, and make certain assurances. *Rubman*, 800 F.3d at 384; *Edwards v. Geisinger Clinic*, 459 F. App'x 125, 131 (3d Cir. 2012); 8 U.S.C. § 1101(a)(15)(H)(i)(b). Once issued, the visa permits the alien to remain in the United States only as long as he or she is working for the sponsoring employer. *United States v. Ramirez*, 420 F.3d 134, 137 (2d Cir. 2005). Regulations confirm an employer, by definition, must have an employer-employee relationship with the prospective employee, "as indicated by the fact that it may hire, pay, fire, supervise, or otherwise control the work of any such employee." 8 C.F.R. § 214.2(h)(4)(ii); *Stellar IT Sols., Inc. v. United States Citizenship & Immigration Servs.*, 2020 WL 3129019, at *2 (D.D.C. 2020). After that time, extensions in three-year increments may be obtained. The visa, although issued in the name of a particular individual, really "travels" with the job and the employer; the visa-holder may not, for example, change employers and continue to work on the visa issued for his or her predecessor employer. *India House, Inc. v. McAleenan*, 449 F. Supp. 3d 4 (D.R.I. 2020). So, in our case, make no mistake about it and regardless of how defendants wish to paint it for the purposes of this discovery dispute, Zaid's H-1B status meant he was an employee, and Bagasrawala was sponsor and employer.

It didn't work out too well for Bagasrawala. Plaintiff's Third Amended Complaint alleges that, during his employment with PCG – about a year into it – Zaid usurped three (3) PCG corporate opportunities involving hotel acquisition or development in Des Plaines and BurrRidge, Illinois and Valparaiso, Indiana. Plaintiff claims his losses and defendant's gains exceeded $13 Million. Plaintiff is asserting claims Fraud and Deceit (Count I), Breach of Fiduciary Duty (Count II), Tortious Interference with Prospective Economic Advantage (Count III) and Unjust Enrichment (Count IV).

Defendant says it wasn't as bad as it looks. Bagasrawala and his family and Zaid and his family had been co-investors in several properties prior to Zaid's employment with, and sponsorship by, Bagasrawala. Supposedly, the families had an understanding that Zaid would be permitted to serve as a member, manager, and investor in various investments outside of his H-1B employment with Bagasrawala. Zaid would be an *independent* investor, free to investigate and pursue new investment and development opportunities on his own, for investment by himself and his family, as well as for other investors while being sponsored as Bagasrawala's ostensible employee. [Dkt. ##85, 114].

Despite his H-1B status, and the job duties described in the sponsorship visa application, Zaid claims that his duties with PCG did *not* include pursuing development deals or potential investments. Any such opportunities he looked into were separate from his work for PCG, supposedly in accordance with his agreement with Bagasrawala. Zaid's view of his work here in the United States was that he was free to pursue hotel developments and other investments that had nothing to do with PCG for the benefit of himself, his family, and other investors. [Dkt. #114-1, Ex. 1, Par. 24]. As Zaid sees it, Bagasrawala only raised the claims at issue in this action after Zaid was

no longer employed by him and after it became clear that the hotel developments in Des Plaines and Burr Ridge and the purchase of the Fairfield Inn in Valparaiso were successful. [Dkt. ##85, 114]

**The Three Hotel Deals**

First we have the Valparaiso Fairfield Inn and Suites. Zaid engaged the law firm of Hoeppner, Wagner & Evans ("HWE"), by all appearances on behalf of PCG. The November 21, 2014 Letter of Intent for the purchase was not only on Pearlshire letterhead, but stated it evidenced "the agreement in principle of Pearlshire Capital Group . . . ." It was signed by Zaid, but clearly on behalf of Pearlshire. [Dkt. #109-6]. Invoices from HWE firm for this deal went to PCG. [Dkt. #109-7]. Zaid also engaged Wolin & Rosen, Ltd. ("WR"), whose invoices also went to PCG. [Dkt. #109-10]. Zaid then created the SPE BSD Hospitality in January 8, 2015. [Dkt. #109-8]. The Firm drew up a purchase agreement originally for PCG in December of 2014, then edited it for BSD. [Dkt. #109-9].

The Des Plaines TIF deal has similar earmarks. Lyon & Caron LLP ("LC") was the firm Zaid engaged, again, ostensibly, on behalf of PCG. Terms of the TIF deal were put together for PCG, and emailed to Zaid. [Dkt. #109-16]. The agreement was clearly between Des Plaines and PCG. [Dkt. #109-17]. The Economic Disclosure Statement was in the name of PCG. [Dkt. #109-19]. Then, about January of 2015, references became PCG d/b/a O'Hare Real Estate. [Dkt. #109-19]. ORE was the SPE Zaid put together to take control of this deal for himself. Zaid has admitted the Economic Disclosure Statement and Affidavit he submitted to Des Plaines April 13, 2015 fraudulently stated that his wholly owned LLC, Pearl Hospitality Manager LLC, held an interest in PCG when the Proposal was submitted. Exhibit 19(A), Des Plaines Declaration; Exh. 3, Answer to RTA Pars. 19-20. Zaid engaged LC in November 2015 on behalf or O'Hare Real Estate. [Dkt. #109-23]. But,

8

remarkably, Zaid claimed he was unaware of Lyon & Caron in Requests for Admissions. [Dkt. #109-3. Pars. 23-24]. "Honesty of purpose prompts frankness of statement." *Crosby v. Buchanan*, 90 U.S. (23 Wall.) 420, 457 (1875).

Finally, there is the Burr Ridge Property. Again, by all appearances it was a PCG deal. The outline of purchase was for Pearlshire Capital Group. [Dkt. #109-28, -29]. Again the LC Firm worked on the deal. [Dkt. #109-30]. The retainer agreement was in the name of PCG. [Dkt. #109-32]. Zaid also retained Goldstine, Skrodzki, Russian, Nemec & Hoff ("GSRNH"), once again on behalf of PCG. [Dkt. #109-33].

The only explanation from Zaid regarding his use of the name of PCG throughout these deals and in retainer agreements and communications with law firms is singularly unsatisfying. Zaid claims he "occasionally" used the PCG name in certain communications and agreements at the early stages of these developments, he intended the name only as a symbol of his "family office" arrangement, and never intended PCG to be a party to the investments. And he closed each investment by a separate entity unaffiliated with PCG, because that was what had *always* been intended. [Dkt. #114-1, Ex. 1,Par. 25]. Moreover, while he "occasionally" used the name of PCG to engage and correspond with the law firms of Lyon & Caron LLP, Wolin & Rosen, Ltd, Hoeppner, Wagner & Evans, and Goldstine Skrodzki (the "Law Firms"), he always intended them to represent him and the entities through which he made his investments. He claims he never intended those firms to represent PCG regarding any of the investments at issue. [Dkt. #114-1, Ex. 1,Par. 27]. Based on that explanation of what he was doing when he repeatedly employed the PCG name in retainer agreements, discussions with attorneys, and investment deals, all while working for PCG on an H-1B visa in a job involving putting together investment deals, Zaid makes a broad, sweeping

9

claim of privilege as to about 800 documents.

**The Documents at Issue**

It is an oft-recited aphorism that the attorney-client privilege is one of the oldest and most widely recognized privileges of confidential communication. *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998). It is intended to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). But, it cannot be stressed enough that there is no presumption in favor of finding a document to be immune from discovery under either the attorney-client privilege or the work product doctrine. Both evidentiary privileges operate in derogation of the search for the truth and run counter to the public's right to every person's evidence. *Swidler & Berlin v. United States*, 524 U.S. 399, 411(1998); *United States v. Nixon*, 418 U.S. 683, 709(1974); *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007); *In re Grand Jury Proceedings (Thullen)*, 220 F.3d 568, 571 (7th Cir. 2000). Accordingly, courts have always construed the privilege narrowly, *Swidler & Berlin*, 524 U.S. at 411, and will not apply it "unless to do so will serve a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Shaffer*, 662 F.3d at 446.

Unfortunately, experience teaches that abuse of the privilege is all too common. *See, e.g., Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 334 F.R.D. 149, 162 (N.D. Ill. 2020); *Motorola Sots., Inc. v. Hytera Commc'ns Corp.*, 2018 WL 1804350, at *1 (N.D. Ill. 2018); *Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F.Supp.3d 889 (N.D. Ill. 2018). Blanket or sweeping claims of privilege are impermissible in all contexts. *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 446 (7th Cir. 2011); *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109,

1118 (7th Cir. 1983); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). The party hoping to withhold evidence from the proceedings – and, to degrees that vary from case to case, thwart the fact-finders' efforts at uncovering the truth – necessarily has the burden of establishing the applicability of the privilege it asserts on a document-by-document basis. *Shaffer v. AMA*, 662 F.3d 439, 446 (7th Cir. 2011); *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 176, 180 (N.D. Ill. 2018); *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 119 (1982)("the burden of showing facts which give rise to the privilege rests on the one who claims the exemption."). Phrased differently, there is no *prima facie* presumption of privilege. *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009); *BankDirect.*, 326 F.R.D. at 176.

Simply put, the defendant has failed to meet his burden. This is not a dispute about Zaid's authority to bind Bagasrawala to a contract or legal malpractice; it is a dispute about whether application of the privilege in these circumstances "will serve a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Shaffer*, 662 F.3d at 446. Zaid has not shown that it will. The evidence Plaintiff has submitted regarding these deals and these communications between Zaid and the law firms is that Zaid was PCG's employee, on a limited H-1B visa, and acting in PCG's name. All that leads to the unassailable conclusion that the privilege belongs to Bagasrawala, not Zaid. On the other hand, the evidence Zaid has submitted is *his* explanation that, sure, he may have used the PCG name "occasionally" but he never meant it the way the evidence makes it look and that his family had a secret agreement with his sponsor to provide him with residency status and a platform to make his own deals. "[B]ut saying so doesn't make it so." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). And mere repetition adds nothing to the claim. *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir.

2012). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018).

The claimed agreement, conveniently or inconveniently as the case may be, is not evidence by any documentation, legal or personal; not a contract or an email. That's not nearly enough for Zaid, given the circumstances of this dispute, to meet his burden of proof here or overcome the evidence on the Plaintiff's side. Indeed, when the court reviewed Zaid's Reply brief, what was significant was not simply a dearth of evidence, but a glaring omission. And, as it was not lost on the Plaintiff, who summed it up this was:

> It would have presumably been quite simple for Zaid to tender real evidence demonstrating that he was the Law Firms' client, such as an engagement letter in his name or an affidavit from even one of the attorneys at four separate law firms averring to Zaid's status as client. Defendants failed to submit any evidence to meet their burden of proving their status as client.

[Dkt. #118, at 4]. Perhaps it would not have been so easy. Again, in his discovery responses, Zaid claimed he had never heard of the law firm he had the most dealings with. [Dkt. #109-3. Pars. 23-24]. There is really very little more that need be said about the record. It speaks for itself.

Corporations, partnerships, LLCs, etc., all can have an attorney client privilege with counsel engaged to represent them, of course. The Plaintiff in this case, PCG, is no different. When an employee – here, Zaid – engages an attorney in the name of his employer corporation or LLC, discusses business opportunities of that LLC with that attorney using the LLC's name, and has the attorney draft agreement and correspondence in the name of that LLC, clearly, to any reasonable observer, whatever privilege may attach to those communications belongs to the LLC and not the employee.

The attorney-client privilege protects communications made in confidence by a client and

a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 394–99 (1981); *Trammel v. United States*, 445 U.S. 40, 51 (1980). The privilege belongs to the client meaning, in a case like this, the corporation or business entity. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)("As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers."); *See Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010)*; United States v. Smith*, 454 F.3d 707, 713 (7th Cir.2006); *Quantlab Grp., LP v. Dempster*, 2019 WL 6913303, at *2 (S.D. Tex. 2019)("It is well-established that an attorney's representation of a partnership does not constitute representation of each of the individual partners."). Entities can act only through agents, and so, "any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee, and that employees generally may not prevent a corporation from waiving the attorney-client privilege arising from such communications." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 215 (2nd Cir. 1997); *see also Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 n.5 (8th Cir. 1977) ("Ordinarily, the privilege belongs to the corporation and an employee cannot himself claim the attorney-client privilege and prevent disclosure of the communications between himself and the corporation's counsel if the corporation has waived the privilege."); *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 276-77 (N.D. Ill. 2004) ("the privilege does not belong to the individual agents of the corporation seeking the advice; the privilege belongs to the corporation, because the corporation is the client."). *United States v. Rankin*, 2020 WL 3036015, at *2 (D. Conn. 2020); *Abington*

13

*Emerson Capital, LLC v. Landash Corp.*, 2019 WL 6167085, at *2 (S.D. Ohio 2019).[2]

It is certainly possible for a corporate employee to seek legal advice from the corporation's attorney or for that attorney to act as a "joint attorney," giving the individual a claim of privilege as well. *Diversified Indus.*, 572 F.2d at 611 n.5; *United States v. Adams*, 2018 WL 5311410, at *8 (D. Minn. 2018). But, the "default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption." *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001). Any objective review of the parties' submissions demonstrates that defendants have done nothing to dispel that presumption.

In order to convince a court to depart from the default presumption – really, what would be apparent to any reasonable observer – that an employee engaging a lawyer on behalf of his employer and using his employer's name, that employee ought to at least be able to show that: the employee made it clear that he was seeking advice individually rather than in a representative capacity; the attorney communicated with the employee in his individual capacity; the communications with counsel were confidential; and the substance of the communications with counsel did not relate to company matters. *Int'l Bhd. of Teamsters*, 119 F.3d at 215 (quoting *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123, 125 (3d Cir. 1986) ). Even where courts do not look for such

---

[2] In Illinois, for the purposes of claiming the privilege, a corporation can only act through a "control group." *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 119 (1982). No privilege attaches to communications between employees outside the control group and counsel. If Zaid is not considered as within the control group, his discussions with counsel hired in the name of PCG are not privileged at all. But this is not really a control-group dispute. It is something much different; an employee seeking to usurp the attorney client privilege over documents and communications that employee had and created in the name of his employer. Accordingly, for this rather novel discovery dispute, we need not visit the complexities of Illinois' control group tests.

a multifaceted showing, courts "have nevertheless required an employee to make it clear to corporate counsel that he seeks legal advice on personal matters in order to assert a privilege over ensuing communications with corporate counsel." *Id. Accord In re Grand Jury Proceedings, Detroit, Mich., August, 1977 (Jackier)*, 434 F. Supp. 648, 650 (E.D. Mich. 1977); *United States v. Merida*, 828 F.3d 1203, 1210 (10th Cir. 2016); *United States v. Sawyer*, 878 F. Supp. 295, 296 (D. Mass. 1995); *United States v. De Lillo*, 448 F. Supp. 840, 842–43 (E.D.N.Y. 1978) ); *Adams*, 2018 WL 5311410, at *9.

All the defendants offer here are some vague assertions about a secret family deal to allow Zaid to go off on a frolic of his own once his visa was sponsored, and Zaid's claimed belief that his use of the name of PCG when engaging counsel and setting up deals meant nothing at all. By way of example, the type of evidence courts look for can be highlighted by *United States v. Smukler*, 333 F. Supp. 3d 484, 491 (E.D. Pa. 2018). There, the court was presented with a detailed report of the purported client's dealings with the attorney in question from that attorney, an audio recording of an FBI interview with purported client; and representations made by the Government regarding the relationship between the purported client and the attorney during the course of an investigation. *Smukler*, 333 F. Supp. 3d at 491. And yet, even based on all that evidence from the purported client, the court concluded that he failed to demonstrate that he had a personal attorney-client relationship with the attorney. The Defendants here do not even come close to presenting that amount of evidence. No one could confuse the defendants' rather cavalier, skeletal presentation with that put together in *Smukler*. Moreover, interestingly, and much like the tack Zaid took in his dealings with the law firms here, the report the attorney submitted in *Smukler* showed that the purported client identified himself *with the entity* he claimed to be representing, as opposed to indicating that the

advice he was seeking was for himself. *Smukler*, 333 F. Supp. 3d at 492.

To come at it from another angle, let's say Zaid hadn't lied about being aware of the law firm and offered some convincing evidence that he sincerely believed he was a client and the law firms were representing him from the start – again, that's despite evidence to the contrary. An individual's subjective belief that he is represented is not alone sufficient to create an attorney-client relationship, as the court made clear in *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir.1985): "We think no individual attorney-client relationship can be inferred without some finding that the potential client's subjective belief is minimally reasonable." *See also In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 339 (4th Cir. 2005). Where, as here, there is an "absence of any relatively clear indication by the potential client to the attorney that he believed *he* was being . . . represented, . . . no . . . attorney-client relationship can be inferred without some finding that the potential client's subjective belief is minimally reasonable. *United States v. Evans*, 113 F.3d 1457, 1465 (7th Cir. 1997). *See also In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 339 (4th Cir. 2005). The Defendants have presented nothing that supports any belief Zaid claims that these were personal engagements of the law firms or his personal business as being reasonable under the circumstances.

At this point, the discussion could go into Zaid's activities once he engaged counsel, but it need not. To do so would be to tread rather heavily on the substantive issues in this case, which is inappropriate on a referral limited to a discovery motion. [Dkt. #104]; *see, eg., Swanson v. Citibank, N.A.*, 614 F.3d 400, 411–12 (7th Cir. 2010)(Posner, J., dissenting in part)(". . . judges tend to delegate [discovery] authority to magistrate judges. And because the magistrate judge to whom a case is delegated for discovery only is not responsible for the trial or the decision and can have only an imperfect sense of how widely the district judge would want the factual inquiry in the case to

roam . . . ."). Suffice it to say that, based on the record in this discovery motion, there is no countenancing what Zaid appears to have done. But we stop short of determining whether it amounted to crime or fraud which would, of course, undue any privilege there might otherwise have existed. That finding is unnecessary because the privilege here belongs to the Plaintiffs to exercise or waive as they see fit. And, as such the Plaintiffs' motion to compel production of the documents at issue is granted and, as discovery has been closed since July 27th, the Defendants are ordered to produce those documents within seven days. Failure to comply with this Order can have significant consequences.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/29/20